## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| KAREN MARCEY Derivatively on Behalf of MYRIAD GENETICS, INC., <br><br> Plaintiff, <br><br>     v. <br><br> MARK C. CAPONE, BRYAN M. DECHAIRO, R. BRYAN RIGGSBEE, HEINER DREISMANN, PH.D., WALTER GILBERT, PH.D., JOHN T. HENDERSON, M.D., DENNIS LANGER, M.D., LEE N. NEWCOMER, M.D., S. LOUISE PHANSTIEL, COLLEEN F. REITAN, and LAWRENCE C. BEST <br><br> Individual Defendants, <br> -and- <br><br> MYRIAD GENETICS, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. |

### VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Karen Marcey ("Plaintiff"), by her attorneys, submits this Verified Stockholder

Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of

Corporate Assets, Unjust Enrichment, and Insider Trading. Plaintiff alleges the following upon

information and belief, except as to the allegations specifically pertaining to Plaintiff which are

based on personal knowledge. This complaint is also based on the investigation of Plaintiff's

counsel, which included, among other things, a review of public filings with the U.S. Securities

1

and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Myriad Genetics, Inc. ("Myriad" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Myriad's reputation, goodwill, and standing in the business community and has exposed Myriad to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Myriad in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.     This action seeks to remedy wrongdoing committed by Myriad's directors and officers from August 9, 2017 through the present (the "Relevant Period").

3.     Myriad is a molecular diagnostic company that develops and markets predictive, personalized, and prognostic medicine tests in the United States and internationally. Myriad was founded in 1991 and is headquartered in Salt Lake City, Utah.

4.     In 2016, Myriad purchased a company that was developing GeneSight, a test that purportedly predicts how a patient will react to medication. Myriad soon after began touting GeneSight's purported potential for pharmacogenomic testing. Pharmacogenomics the study of how genes affect a person's response to drugs. The panels of a pharmacogenomic test could allegedly assist in identifying various drugs for the treatment of depression, pain management, and attention deficit hyperactivity disorder ("ADHD").

5.     Myriad reported the panel for identifying drugs for the treatment of depression presented the largest financial opportunity.

2

6.      An important factor to ensure the success of GeneSight was its acceptance and adoption by doctors, and to secure reimbursement by insurance companies. Thus, it was essential that Myriad demonstrated clinical data to support GeneSight's efficacy, which it tried to do through a clinical trial it sponsored, called Genomics Used to Improve Depression Decisions, (the "GUIDED study").

7.      Despite the Company's efforts to prove GeneSight's efficacy, the GUIDED study was a failure because it did not achieve its primary endpoint.  The Individual Defendants and Myriad, however, grossly misrepresented the results claiming they in fact supported GeneSight's efficacy, when in fact they did not.

8.      During the Relevant Period, the Individual Defendants, (defined below) caused or allowed the Company to make false and misleading statements regarding Myriad's key products, including: (a) overstating the purported scientific support for the efficacy of its genotyping test intended to help doctors prescribe medications for depression and certain other conditions based on the patients genes, known as GeneSight; (b) claiming that the GeneSight psychotropic test was clinically proven, including by the findings of the GUIDED study when it was not; (c) stating that the GUIDED study was done in compliance with FDA guidance and falsely describing the FDA's investigation into the GeneSight test; and (d) overstating the revenues from its hereditary cancer test, "myRisk" a test for analyzing the risk of developing certain types of hereditary cancers.

9.      Myriad was motivated to engage in this vigorous campaign to expand payor coverage and physician adoption of GeneSight. This false hype had the effect of artificially inflating the Company's stock price, all the while Individual Defendants Mark C. Capone ("Capone"), R. Bryan Riggsbee ("Rigsbee") and Dennis Langer, M.D. ("Langer") sold over $17.2 million worth of their stock in the Company at inflated prices. The truth regarding the Individual

Defendants' scheme began to be revealed in late 2019 when the true lack of gene-drug connection, the central premise of the product, GeneSight, and the problems with hereditary cancer test revenue were revealed to shareholders in a series of adverse disclosures Myriad was forced to make.

10.     After almost two years of touting GeneSight and the purported success of the GUIDED study, Myriad disclosed in August 2019 that the U.S. Food and Drug Administration ("FDA") had said that it had questions about the test panel for psychotropic drugs and asked Myriad to make changes to GeneSight. Myriad also stated that the FDA had required it to discontinue GeneSight's other two panels (for analgesic and ADHD drugs) in May 2019 due to lack of "clinical evidence." In response to this news, the Company's share price declined in August 2019.

11.     Then on November 4, 2019, Myriad revealed that it had overstated revenue from its hereditary cancer tests, including beginning on January 1, 2019, which meant the Company was required to make an $11.2 million out-of-period adjustment and drop its revenue accrual model by at least 8% going forward. Myriad was aware of the background factors which led to the reduced hereditary cancer test revenue much earlier, but did not disclose these factors in a timely way. When the market did eventually become aware of this information the Company had been withholding, the stock again declined.

12.     On February 6, 2020, shortly after these disclosures, Myriad abruptly announced that Defendant Capone, after serving at the Company for 17 years, was resigning as President, CEO and director, effective immediately. Together with this news, the Company also announced that GeneSight revenues were lagging following the August 2019 disclosures.

13.     The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these materially false and misleading statements and

omissions. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

14.     As detailed herein, and as alleged in the ongoing federal securities class action in the District of Utah styled *In re Myriad Genetics, Inc. Securities Litigation*, No. 2:19-cv-00707-DBB, (the "Federal Securities Class Action"), Myriad's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

15.     The Federal Securities Class Action is ongoing and on March 16, 2021, Judge David Barlow issued an order denying defendants' motion to dismiss. *See*: Dkt. No. 73. The District Court held that plaintiff's claims for securities fraud were adequately alleged under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Id.* at pg. 27.  Judge Barlow sustained allegations that Individual Defendants Capone, Rigsbee, and Dechairo materially made false and misleading statements about the GUIDED study, GeneSight, and hereditary cancer revenue, and that they acted with scienter, or intent to defraud. Moreover, Judge Barlow held that some of the defendants' stock sales and the circumstances surrounding Defendant Capone's sudden departure from Myriad were probative of scienter, sufficiently stated under the heightened pleading standards. *Id.* at pg. 54.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and raise a federal question pertaining to the claims made in the Federal Securities Class Action based on violations of the Exchange Act.  This

Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have such jurisdiction.

18.     Venue is proper in this District because Myriad is incorporated in this District, and the Defendants activities have had an effect in this District.

## THE PARTIES

### Plaintiff

19.     Plaintiff Karen Marcey is and has continuously been a stockholder of Myriad during the wrongdoing complained of herein.

### Nominal Defendant

20.     Nominal Defendant Myriad is a Delaware corporation with its principal executive offices located at 320 Wakara Way, Salt Lake City, Utah 84108. Myriad's shares trade on the NASDAQ under the ticker symbol "MYGN."

### Individual Defendants

21.     Defendant Capone served as President, CEO, and director of Myriad from June 2015 until his resignation from those roles on February 6, 2020. Thereafter, Capone continued to serve as a non-executive Myriad employee until May 1, 2020, after which he transitioned to providing consulting and advisory services for a five-month period ending September 30, 2020.

22.     During the Relevant Period, Defendant Capone made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 5/30/2018 | 90,000 | $38 | $3,420,000 |
| 7/11/2018 | 77,654 | $41 | $3,183,814 |

| 7/11/2018 | 2,346 | $41 | $96,186 |
|---|---|---|---|
| 8/1/2019 | 70,672 | $44 | $3,109,568 |
| 8/1/2019 | 4,328 | $44 | $190,432 |
| 8/1/2019 | 58,138 | $44 | $2,558,072 |
| 8/1/2019 | 3,862 | $44 | $169,928 |
| **Totals** | **307,000** | | **$12,728,000** |

23.     In total, Capone sold over 307,000 Company shares with inside information, for which he received approximately $12.7 million. His insider sales were made while in possession of material non-public information regarding the FDA having serious questions about GeneSight due to lack of clinical evidence and that Myriad had overstated revenue from its hereditary cancer tests.

24.     Defendant Bryan M. Dechairo ("Dechairo") served as Myriad's Executive Vice President of Clinical Development from August 2017 until April 2021. Prior to that, Dechairo served as the Chief Medical Officer and Chief Science Officer of Assurex Health, Inc., the original developer of the GeneSight test and a Myriad subsidiary since August 2016.

25.     Defendant Riggsbee has served as Myriad's CFO since October 2014. On February 6, 2020, Riggsbee was appointed interim President and CEO and served in that role until August 13, 2020, during which time he retained his duties as CFO.

26.     During the Relevant Period, Defendant Riggsbee made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 8/1/2019 | 25,000 | $41.50 | $1,037,575 |

27.     In total, Riggsbee sold 25,000 Company shares with inside information, for which he received over $1 million. His insider sale was made while in possession of adverse material

non-public information regarding the FDA having serious questions about GeneSight due to lack of clinical evidence, and that Myriad had overstated revenue from its hereditary cancer tests.

28.     Defendant Heiner Dreismann, Ph.D. ("Dreismann") has served as a Myriad director since June 2010.

29.     Defendant Walter Gilbert, Ph.D. ("Gilbert") served as a Myriad director from March 1992 until December 2020.

30.     Defendant John T. Henderson, M.D. ("Henderson") served as a Myriad director from May 2004 until December 2020. Henderson served as Myriad's Chairman from April 2005 until March 2020.

31.     Defendant Langer has served as a Myriad director since May 2004. During the Relevant Period, Defendant Langer made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 5/21/2018 | 10,000 | $35.90 | $359,000 |
| 5/30/2018 | 10,000 | $37.92 | $379,245 |
| 6/1/2018 | 30,000 | $38.90 | $1,167,000 |
| 6/4/2018 | 10,000 | $39.90 | $399,000 |
| 6/4/2018 | 8,404 | $39.90 | $335,319 |
| 6/5/2018 | 1,227 | $39.90 | $48,957 |
| 6/6/2018 | 3,609 | $39.37 | $142,088 |
| 6/7/2018 | 3,096 | $39.35 | $121,827 |
| 6/8/2018 | 13,664 | $39.35 | $537,678 |
| **Totals** | **90,000** | | **$3,490,116** |

32.     In total, Langer sold 90,000 Company shares with inside information, for which he received approximately $3.5 million. His insider sales were made while in possession of adverse material non-public information regarding the FDA having serious questions about GeneSight due to lack of clinical evidence, and that Myriad had overstated revenue from its hereditary cancer tests.

8

33.     Defendant Lee N. Newcomer, M.D. ("Newcomer") has served as a Myriad director since September 2019. Newcomer served as a member of the Compensation and Human Capital Committee during the Relevant Period.

34.     Defendant S. Louise Phanstiel ("Phanstiel") has served as a Myriad director since September 2009. Phanstiel has served as Myriad's Chairperson since March 2020.

35.     Defendant Colleen F. Reitan ("Reitan") has served as a Myriad director since September 2019.

36.     Defendant Lawrence C. Best ("Best") served as a Myriad director from September 2009 until December 2020.

37.     Collectively, Capone, Dechairo, Riggsbee, Dreismann, Gilbert, Henderson, Langer, Newcomer, Phanstiel, Reitan and Best are referred to herein as the "Individual Defendants."

38.     The Individual Defendants, because of their positions with Myriad, possessed the power and authority to control the contents of Myriad's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

39.     Myriad's cancer tests, including the Company's "myRisk" test, are DNA sequencing tests utilized for analyzing the risk of developing certain types of hereditary cancers.

40.     Myriad's depression test, GeneSight, is a DNA genotyping test, aimed to help doctors prescribe psychotropic depression medications.

41.     In comparison to pharmaceutical drugs or medical devices, which require rigorous FDA approval process to ensure the drugs meet their intended purposes and are safe, genetic laboratory tests like GeneSight and others manufactured by Myriad are not subject to the same rigorous regulatory requirements. Accordingly, it is up to the companies developing these tests to convey truthful and accurate information to all stakeholders, including investors as to the safety and efficacy of these tests.

42.     Taking advantage of this different standard and level of trust given to companies developing laboratory tests, and lowered FDA scrutiny, Myriad, for more than two years, misled investors about the efficacy of its laboratory tests by issuing false and misleading statements about GeneSight which had the effect of inflating the Company's stock price.

43.     GeneSight was a test originally produced by Assurex Health, Inc. ("Assurex"), which Myriad purchased in August 2016. Before the beginning of the Relevant Period, on August 3, 2016, the Company marketed this acquisition and GeneSight via a website dedicated to that product. Defendant Capone said that "Assurex provides Myriad access to GeneSight, one of the fastest growing new diagnostic tests ever in a multi-billion-dollar global market and builds upon

Myriad's commitment to expand into neuroscience, positioning us for long-term growth."[1]

44.     During the Relevant Period, Myriad alleged that GeneSight could assist doctors in prescribing medication which would improve outcomes for their patients because the information could be utilized by doctors to predict how patients would respond to drugs based on their genetic makeup. Initially, GeneSight included three different "panels" of tests: (1) psychotropic drugs for the treatment of depression; (2) analgesic drugs for pain management; and (3) drugs for the treatment of ADHD. Myriad alleged that GeneSight used a proprietary algorithm to make recommendations for specific drugs based on a patient's genetic makeup. GeneSight could allegedly classify commonly prescribed drugs into three categories: green, yellow, or red. Green suggests the drug would likely be well tolerated and efficacious. Yellow shows the drug may have a "moderate gene-drug interaction," meaning doctors may want to alter the drug's dosing to improve patient results. Red shows a "significant gene-drug interaction," meaning the drug may be poorly tolerated or ineffective for the patient. This mechanism to tailor a patient's drug therapies was GeneSight's key selling point and justification for the high price tag GeneSight had compared to other products on the market.

45.     From the outset, the Individual Defendants aggressively touted to investors GeneSight's purported benefits.

46.     GeneSight's apparent market potential caused Myriad's stock price to swell rapidly in the months following the Assurex acquisition. However, behind this hype was a false and misleading campaign by the Individual Defendants to tout GeneSight's potential while downplaying and hiding the truth. The Individual Defendants knew that GeneSight was not what

---

[1] See GeneSight Website. 'Assurex Health to be Acquired by Myriad Genetics' (August 3, 2016) https://genesight.com/news-and-press/assurex-health-to-be-acquired-by-myriad-genetics-2/

they were selling it as, to investors.

**Individual Defendants' Materially False and Misleading Statements and Omissions Concerning the Efficacy of GeneSight, the Results of the GUIDED Study, Interactions with the FDA, and Myriad's Hereditary Cancer Test Revenue**

*The Alleged Efficacy of GeneSight*

47.    The Relevant Period begins on August 9, 2017, when Myriad filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended June 30, 2017 (the "2017 10-K"), signed by Defendants Capone, Riggsbee, Henderson, Gilbert, Best, Dreismann, Langer, and Phanstiel. The 2017 10-K falsely claimed that GeneSight, including its ADHD and chronic pain (analgesic) panels, "meets a significant unmet clinical need," and was "clinically proven to enhance medication selection":

> In the neuroscience market, our GeneSight test meets a significant unmet clinical need and is the leading product for psychotropic drug selection. It is used by healthcare providers to help patients who are affected by neuropsychiatric conditions including depression, anxiety, ADHD, bipolar disorder, schizophrenia, post-traumatic stress disorder (PTSD) and other behavioral health conditions, as well as chronic pain. The test is clinically proven to enhance medication selection, helping healthcare providers get their patients on the right medication faster.

48.    On August 24, 2018, Myriad filed its Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended June 30, 2018 (the "2018 10-K"), signed by Defendants Capone, Riggsbee, Henderson, Gilbert, Best, Dresimann, Langer, and Phanstiel. The 2018 10-K included the same language as set forth above from the 2017 10-K.

49.    The statements above in the 2017 and 2018 10-Ks were materially false and misleading because rather than GeneSight satisfying an unmet need or being proven to enhance

medication selection in patients with ADHD or chronic pain, Myriad did not have clinical evidence showing GeneSight's ability to meet a clinical need, or enhance medication selection, in patients with ADHD or chronic pain. In fact, by the time that Myriad filed the 2017 10-K and 2018 10-K, it was the internal consensus at Myriad that there was not clinical support for the efficacy of GeneSight's ADHD and chronic pain panels.

50.     Additionally, throughout the Relevant Period, Myriad's GeneSight website advertised the GeneSight ADHD and analgesic panels as part of the "clinically proven" GeneSight product offering.  Specifically:

- As of August 23, 2017 and May 15, 2019, for the ADHD panel, the GeneSight website claimed that "If you or your child have Attention-Deficit / Hyperactivity Disorder, this genetic test can help quickly and accurately determine which drugs will work best with your (or your child's) genes";

- As of August 23, 2017 and February 22, 2019, for the chronic pain panel, the GeneSight website claimed that "For those experiencing acute or chronic pain, this genetic test analyzes how your genes affect your body's response to FDA-approved opioids, NSAIDs and muscle relaxants to accurately determine which medications are optimal";

- As of July 26, 2018 and February 22, 2019, the GeneSight website claimed that "[GeneSight] can help quickly and accurately determine which ADHD medications will work best with your (or your child's) genes";

- As of July 26, 2018, the GeneSight website claimed that "[t]he GeneSight ADHD genetic test can reduce [the anxiety of taking ADHD drugs] by helping doctors to identify and avoid ADHD medications more likely to cause side effects based on your genetics";

- As of July 26, 2018, the GeneSight website claimed that "The GeneSight Analgesic genetic test analyzes how your genes affect your body's response to FDA-approved opioids, NSAIDs and muscle relaxants commonly prescribed to treat acute or chronic pain, opioid dependency and osteoarthritis (OA)" and "Results can help your healthcare provider select the medications that best complement your genes and help you feel well again";

- As of May 15, 2019, the GeneSight website claimed that "this genetic test analyzes how your genes affect your body's response to FDA-approved opioids, NSAIDs and muscle relaxants to accurately determine which medications are optimal"; and

- As of February 22, 2019, the GeneSight website claimed that patients were "2x more likely to respond to selected meds after taking the GeneSight test."

51.     The above statements from the GeneSight website were materially false and misleading when made because Myriad did not have clinical evidence to support GeneSight's ability to quickly and accurately determine which ADHD drugs will work best with a patient's genes or accurately determine which pain medications are optimal for a given patient. Further, it did not have clinical evidence to help doctors identify and avoid ADHD medications more likely to cause side effects based on a patient's genetics; analyze how genes affect your body's response to medications prescribed to treat acute or chronic pain; or help healthcare providers to select the medications that best complement your genes and help you feel well again. In truth, as Individual Defendants were aware, there was no meaningful evidence supporting GeneSight's alleged ability to predict patient response to particular ADHD or pain relief drugs. In fact, the data did not support inclusion of the ADHD and analgesic panels in the GeneSight offering.  Myriad's claims to the contrary were unsubstantiated.

52.     On August 1, 2019, Myriad filed a Form 8-K announcing that "UnitedHealthcare has issued a positive coverage decision for pharmacogenetic testing for multi-gene panels including the company's GeneSight Psychotropic test. The coverage is for patients that have a diagnosis of major depressive disorder or anxiety and have failed at least one prior medication to treat their condition."

53.     The above statement was materially false and misleading when made because while it boasted about GeneSight and its commercial prospects, the Company failed to disclose that: (1) Myriad had removed the ADHD and analgesic GeneSight panels; and (2) the FDA had privately expressed serious concern to Myriad about GeneSight and had requested the Company make changes to the test which would make it commercially unfeasible.

14

*The Individual Defendants Falsely Explain the Results of the GUIDED Study*

54.    On November 2, 2017 Myriad issued a press release wherein it announced results from the GUIDED study, stating:

> The study was designed to evaluate three key endpoints relative to HAMD-17 scores: remission (HAMD-17 score ≤7), response (HAMD-17 reduction >50%), and symptom reduction.

> Patients receiving the GeneSight test achieved a clinically meaningful and statistically significant improvement in both remission rates (p<0.01) and response rates (p=0.01) at eight weeks compared to the treatment-as-usual group. In addition, patients who received the GeneSight test had a greater reduction in HAMD-17 scores after eight weeks, compared to the treatment-as-usual group, with the difference approaching   statistical significance (p=0.1). Lastly, the improvement in remission, response, and symptoms continued throughout the 24-week study period, demonstrating the durability of the benefit through that period.

55.    Myriad's November 2, 2017 press release quoted John Greden, the study's paid author, "better but not well is not good enough and significant improvements in response and remission are always the most-desired endpoints." Additionally, Defendant Dechairo stated in the press release that "[i]mproving remission and response rates are key treatment goals of clinicians because they directly improve patients' lives and reduce healthcare costs. These endpoints also align with payer goals, and we look forward to having those discussions in the coming months."

56.    The statements in the above press release were materially false and misleading because, as opposed to the Individual Defendants' claims, the GUIDED study was not designed to evaluate three key endpoints. Instead, the GUIDED study had one endpoint, symptom reduction, which GeneSight did not achieve. Rather than being key endpoints, the Individual Defendants narrowly selected "response" and "remission" results which were only two of the study's 65 secondary endpoints. Also, contrary to the Individual Defendants' statements that GeneSight patients in the study achieved clinically meaningful and "statistically significant" improvement in response and remission, FDA guidance and standard clinical trial practice demonstrated that these

secondary endpoints could not even be analyzed, as there was no "demonstration of a treatment effect on the primary endpoint family." Therefore, in reality, the "response" and "remission" results that Individual Defendants boasted about gave no solid data for GeneSight's efficacy. Individual Defendants' allegation that GeneSight patients in the GUIDED study experienced "statistically significant improvement" in response and remission was false and misleading because, in truth, when these results are analyzed in accordance with Myriad's own prespecified rules for the GUIDED study, there is no statistically significant difference in response and remission rates between GeneSight and patients treated as usual.

57.     On November 7, 2017, Myriad held the Q1 2018 earnings call. The Compant's fiscal year ends on June 30. During the call, Defendant Capone discussed the purportedly positive results of the highly-anticipated GUIDED study:

> The primary goal was to assess the HAM-D17 scores at 4 and 8 weeks compared to baseline and to calculate 3 endpoints: percent of patients in remission; percent of patients that are responders; and the percent symptom reduction.

> We believe the data from this study ***clearly demonstrates the clinical utility of the GeneSight test.*** We saw an improvement in depressive symptoms for the entire cohort, which was approaching statistical significance. More importantly, in ***the 2 most critical endpoints for physicians and payers, response and remission, we achieved a high degree of statistical significance.*** Lastly, the improvement in remission, response and symptoms continued throughout the 24-week study period, demonstrating the durability of the benefit through that period.

> \* \* \*

> ***GeneSight achieved statistical significance for the 2 gold standard clinical outcomes of response and remission*** in the 1,200-patient prospective randomized controlled trial. This is a landmark event in our company's history, and we believe will pave the way for broader GeneSight adoption and payer coverage.

> \* \* \*

> For GeneSight to achieve ***clinically meaningful and statistically significant improvements in the remission and response endpoints*** certainly exceeded our expectations.

* * *

In summary, with GeneSight now having amassed an extensive dossier for treatment-resistant depressed patients, and having **demonstrated success** in [the GUIDED study] prospective clinical study, we continue to believe this product can materially transform our financial performance in the future.

* * *

The reason that the clinical trial milestone was tied to symptoms is that in historical antidepressant studies, symptom reduction as a continuous variable is generally the easiest end point to hit. That was certainly the perception in this case, and so we agree that we would accept that as the singular milestone payment for this particular agreement was that -- on that symptom reduction . . . But we accepted that as the sole endpoint because in a traditional antidepressant study, it is the easiest endpoint to meet. I think what is important to note is it was not the endpoint because it was the most important. It was really because as we negotiated a deal, it was perceived as the easiest, and I think that's an important distinction… After the 12-week endpoint, the 8-week end point was the **primary endpoint for the evaluation of those 3 remission, response and symptom reduction.**

(Emphasis Added).

58.     The statements in the above press release were materially false and misleading for the same reasons outlined at ¶ 56 above.

59.     On February 6, 2018, on the Myriad 2Q 2018 earnings call, Defendant Capone continued to tout the purported success of the GUIDED study's "top-level" data:

With GeneSight, we released top line data, demonstrating the ability of the test to improve **the gold standard clinical outcomes of remission and response in the largest pharmacogenetics study ever conducted**.

* * *

We remain excited about the presentation and publication of the full data set from our 1,200-patient randomized controlled trial by the end of this fiscal year. Early feedback and the top line data from physicians has been exceptional, with doctors clearly impressed at the **statistically significant improvements in the gold standard clinical outcomes of remission and response**, given the unprecedented comparison to an actively managed optimized drug control arm.

(Emphasis Added).

60.     The statements in the above press release were materially false and misleading for

the same reasons outlined at ¶ 56 above.

61.     On May 8, 2018, Myriad also held its 3Q 2018 earnings call. On that call, Defendant

Capone boasted about the results from the GUIDED study:

> Our positive top line results from the randomized clinical trial continues to result in increased interest and utilization . . . With GeneSight, we presented the landmark results from the randomized controlled trial yesterday at the American Psychiatric Association meeting. The data showed the ability of GeneSight to ***significantly improve outcomes in treatment-resistant depressed patients*** when compared to a physician-optimized drug control arm in the largest prospective pharmacogenomics study in history.

(Emphasis Added).

62.     During the call, Defendant Dechairo further boasted about the results of the

GUIDED study through a misleading interpretation of the GUIDED study data:

> I would like to begin the discussion with GeneSight results starting with the ***3 clinical outcomes of remission, response and symptom improvement over the 8-week blinded period of the study***. Importantly, the GeneSight-guided arm performed better in all 3 areas, showing a highly statistically significant improvement in remission and response rates and an improvement in symptoms that was trending towards statistical significance. Impressively, GeneSight led to a 50% improvement in remission and a 30% improvement in response rate relative to the treatment-as-usual arm. This is the first time to our knowledge that a technology has demonstrated a statistically significant improvement in outcomes relative to an active drug arm for depression.
>
> The explanation for symptom improvement trending towards statistical significance can be seen on this slide. The chart on the left shows the relative symptom improvement at the 8-week time point in the GeneSight arm compared to the treatment-as-usual arm based upon the worst color medication the patient was taking when entering the study. The results are exactly what you would expect. For patients entering the study on a green medication, the GeneSight test provides little benefit because the medications remain unchanged in both arms. For patients entering on a yellow medication, there are improved outcomes in the GeneSight arm because the test identified the direction of dose adjustment needed to match the patient's genetic profile. The most significant benefit is for patients entering on red medication because the GeneSight report will identify the genetic mismatch and recommend other more appropriate medication. ***In the study, patients entering on red medications in the GeneSight arm saw a 33% relative improvement in symptoms compared to those entering on red medications in the TAU arm when evaluated at the 8-week time point.*** However, only 21% of patients entered the study on red medication. As a result, when the entire cohort is analyzed, the

significant symptom improvement for patients entering on red medications is diluted by the 79% of patients that entered the study on green or yellow medications.

***Now I would like to look at a deeper analysis for patients who are on genetically incongruent medications at baseline*** . . . . Importantly, from a clinical utility perspective, patients in the GeneSight-guided arm saw a 57% decrease in incongruence rate, while the treatment-as-usual arm experienced a 9% increase in incongruence rate. ***This clearly demonstrates that the trial-and-error methodology did not lead to higher rates of genetic congruence over time. Only when guided by GeneSight were physicians able to increase congruence.***

The study data showed that those patients who entered the study on a genetically incongruent medication ***performed significantly better when switching to a congruent medication.***

\* \* \*

You can see the durability of these results across the open-label period of the study. Patients continued to see improvements in all 3 major clinical endpoints with remission rates at 24 weeks of 30%, response rates of 45% and symptom improvement of 42%.

\* \* \*

***The study showed the ability of GeneSight to improve remission and response rates with a durable result that improved over time, and it establishes a new standard of care to identify patients on incongruent medications and switch them to congruent medications.*** We believe this level 1 evidence will provide a significant catalyst to broaden payer coverage when combined with the current and future health economic publications.

(Emphasis Added).

63.     On August 21, 2018, during Myriad's Q4 2018 earnings call, Defendant Capone stated that the GUIDED study had positive, statistically significant results and also claimed that GeneSight was "the first pharmacogenomics technology to demonstrate ***statistically significant changes in response and remission rates*** versus an active drug arm." Additionally, Defendant Capone said that the publication of the GUIDED study data would put Myriad in a "strong position

to receive additional coverage decisions" and that *"the GUIDED [] stud[y] [was] in the later stages of review"* for publication.  (Emphasis Added).

64.     These statements were materially false and misleading when made because: (i) the results could not be described as "positive," and indeed it was misleading and false to do so because FDA guidance and standard clinical trial practice prescribed that the GUIDED study's response and remission endpoints could not even be analyzed, as there was no "demonstration of a treatment effect on the primary endpoint family"; (ii) the GUIDED study did not achieve statistical significance on the secondary endpoints of response and remission; (iii) Myriad failed to report the results of a multiplicity adjustment, which would have demonstrated to investors that the response and remission endpoints in fact lacked statistical significance; (iv) as Myriad scientists internally recognized, neither response nor remission has ever been set as the prespecified primary endpoint of a depression trial and lacked the clinical value that the Individual Defendants misleadingly ascribed to them; and (v) the GUIDED study was not in the "later stages of review."

65.     On August 24, 2018, Myriad filed the 2018 10-K. The 2018 10-K claimed that "[m]ultiple clinical studies have shown that when clinicians used GeneSight to help guide treatment decisions, patients were more likely to respond to the selected medication compared to standard of care." The 2018 10-K also noted "results from the GeneSight GUIDED randomized controlled trial at the American Psychiatric Association annual meeting," and stated that "[t]he landmark study *showed that patients receiving GeneSight had significantly better outcomes with a 50 percent increase in remission rates and a 30 percent increase in response rates relative to those who received standard of care therapy."*

66.     The statements in the above press release were materially false and misleading for the same reasons outlined at ¶ 56 above.

20

67.     On the November 6, 2018 Q1 2019 Myriad earnings call, Defendant Capone stated:

For GeneSight, we are anticipating acceptance of the landmark GUIDED publication by the end of the fiscal second quarter. While we had anticipated this publication earlier, it was delayed because the manuscript was withdrawn and submitted to a second journal. At the end of the review process, the first journal notified the company that as a condition of publication the proprietary GeneSight algorithm would need to be disclosed. Solely based upon the desire to protect our intellectual property, the manuscript was withdrawn and submitted to another journal, and we are anticipating acceptance in the second quarter.

68.     The above statement that Myriad had voluntarily withdrawn the GUIDED study manuscript only because Myriad wanted to protect its intellectual property from disclosure was false and misleading because the journal in question had instead rejected the GUIDED study manuscript because, Individual Defendants' assertions about the GUIDED study data were scientifically incorrect.

69.     During the call, Defendant Capone further boasted about Myriad's allegedly favorable post-hoc analyses of the GUIDED study data and implicated this provided strong support for GeneSight's efficacy:

An additional analysis compared 57% of patients that switched to the 43% of patients that did not. And it was shown *that patients switching from red medications experienced a 153% increase in remission, a 71% increase in the response and a 59% improvement in symptoms, and all of these results were highly statistically significant.* In fact, modeling has shown that had the 43% of patients also switched from red medications, all endpoints improved and were statistically significant.

(Emphasis Added).

70.     The above statements were materially false and misleading when made because the results of Myriad's post-hoc subgroup analyses were neither statistically significant nor clinically meaningful, as Myriad's scientists also internally acknowledged.

71.     On January 4, 2019, Myriad's GUIDED study medical journal article, partly written by Defendant Dechairo, was published in the *Journal of Psychiatric Research* ("the January 4, 2019 GUIDED study medical journal article"). The article stated:

- "[I]mprovements in response (26.0% versus 19.9%, p = 0.013) and remission (15.3% versus 10.1%, p = 0.007) were statistically significant";

- "Patients taking incongruent medications prior to baseline who switched to congruent medications by week 8 experienced greater symptom improvement (33.5% versus 21.1%, p = 0.002), response (28.5% versus 16.7%, p = 0.036), and remission (21.5% versus 8.5%), p = 0.007) compared to those remaining incongruent";

- "Pharmacogenomic testing . . . did significantly improve response and remission rates for difficult-to-treat depression patients over standard of care";

- "Differences in the key secondary outcomes of response and remission were positive and significant";

- "The analysis of patients on incongruent medications at baseline showed that outcomes were significantly improved among those who switched to a congruent medication by week 8";

- "When only patients taking genetically incongruent medications at baseline were assessed, symptom improvement was significantly better among patients who switched to congruent medications at week 8 compared to those who remained on incongruent medications (Δ = 12.4%, p = 0.002)";

- "[T]he modest but important improvements in response and remission for patients in the guided-care arm are clinically meaningful";

- "[T]his randomized controlled trial found that weighted and combined multi-gene pharmacogenomic testing significantly increased clinical response and remission rates for patients with MDD [major depressive disorder] in the guided-care arm versus TAU [treatment as usual]. Pharmacogenomic testing predominantly helped those patients whose treatment resistance may have been related to genetically incongruent medications. These results from the GUIDED study indicate that pharmacogenomic testing is effective in improving response and remission rates among those with prior treatment resistance, particularly for patients who are treated with medications that are incongruent with their genetic profile"; and

- "Continuous changes in HAM-D17 score from baseline to week 8 were assessed to evaluate why the continuous endpoint of symptom improvement did not reach statistical significance while the categorical endpoints (response, remission) were significant. This revealed that the

distribution of continuous HAM-D17 score improvement from baseline to week 8 was shifted towards extreme improvement (>50% decrease in HAM-D17; definition of response) in the guided care arm and towards modest improvement in TAU (Supplemental Fig. 2). As a result, the mean HAM-D17 improvement was similar for both study arms (Δ2.8%, p = 0.107) while the proportion of patients with extreme improvement in the guided-care arm drove a significant difference in the rate of response and remission."

72.     On January 4, 2019, following Myriad held a conference call with investors concerning the GUIDED study. On that call, Defendants Capone and Dechairo repeated the alleged strength of the GUIDED study data, saying GeneSight demonstrated improvement on every endpoint and statistically significant results. During the call, Defendant Dechairo stated, in relevant part:

The next slide shows the results for the 3 outcomes of remission, response and symptom improvement over the 8-week blinded period of the study. ***Importantly, the GeneSight GUIDED arm performed better in all 3 endpoints, showing a highly statistically significant improvement in remission and response rates and an improvement of symptoms that was approaching statistical significance.***

Overall, GeneSight led to a 50% improvement in remission rates, a 30% improvement in response rates, and an 11% improvement in symptoms relative to the treatment-as-usual arm. ***This is the first time, to our knowledge, that a technology has demonstrated a statistically significant improvement in overall outcomes relative to an optimized active drug arm for depression.***

The next slide shows the durability of results. Importantly, all 3 key endpoints of remission rates, response rates and symptom improvement continued to improve over the 24-week time frame, and remission rates more than doubled between week 8 and week 24 in the GeneSight GUIDED arm. This finding has been well received by payers that wanted assurance that the GeneSight benefits are enduring.

* * *

Additionally, in the endpoints used by the FDA and payers, 4 out of the 6 achieved statistical significance, and the other 2 approached significance of p values of 0.07. Also, every endpoint demonstrated statistical significance in at least one of the depression instruments, including symptom improvement…The robustness and breadth of these results provide even further evidence that

GeneSight GUIDED therapy provides superior outcomes for treatment-resistant depressed patients

(Emphasis added).

73.     The statements in the above press release were materially false and misleading for the same reasons outlined at ¶ 56 above. Additionally, the results of Myriad's post-hoc subgroup "congruent/incongruent" analyses were neither statistically significant nor clinically meaningful, as Myriad's scientists also internally acknowledged.

74.     Also, on the January 4, 2019 call, Defendants Dechairo and Capone continued to boast about the results of the GUIDED study, highlighting the results of yet another post-hoc analysis of the GUIDED data as strongly demonstrating the product's efficacy:

**Dechairo**: Additional analyses were performed on the 21% of patients that entered the study on red, genetically incongruent medications, who should benefit the most from GeneSight testing. Note that in the treatment-as-usual arm, without the benefit of the GeneSight report, the percent of patients on red medications actually increased over the 8-week study period demonstrating that physicians were unable to improve congruence using the trial-and-error approach. However, in the GeneSight arm, 57% of patients were switched from red medications, significantly improving congruence.

There were 3 factors that contributed to the 43% of patients who remained on red medications in the GeneSight arm: first, switching was not required in the protocol; second, physicians were naive to GeneSight; and third, patients were blinded to the fact that they were taking red medications.

Because some patients remained on red medications and some were switched, we were able to do a separate analysis comparing these 2 patient groups. ***When comparing these 2 patient groups, the patients that switched from red medications experienced remission rates that were 153% higher, response rates that were 71% higher and symptom improvement that was 59% higher. All of these results were highly statistically significant.***

* * *

**Dechairo**: An additional analysis was performed based upon other observations noted during the manuscript review process. The peer protocol analysis was diluted by the 30% of patients that entered the study on green medications only and who were not expected to benefit from GeneSight. As an important additional analysis – an important additional analysis was performed on the intent-to-treat

patient cohort that excluded these patients. This data will be featured in an upcoming additional publication.

Comparing the GeneSight and TAU arms in the patients entering on yellow or red medications, all 3 endpoints were statistically significant with a 70% increase in remission, a 42% improvement in response rates, and a 23% improvement in symptoms. This analysis clearly demonstrates that GeneSight improves outcomes for the 70% of patients taking medications that require modification based upon their genetic profile.

\* \* \*

**Capone**: As we've noted before in our discussions, those payers really had little to no questions at all about symptom improvements. They were very much focused on remission and response, and they've never seen data whereby remission and response were statistically significantly improved when compared to an active drug arm.

\* \* \*

One of the other things I can mention because it's working its way to a poster is HAM-D6. There are opinion leaders that believe that HAM-D6 is a more sensitive approach to looking at outcomes compared to HAM-D17, and that data looks exciting.

\* \* \*

**Dechairo**: One, on the follow-on from GUIDED deeper analyses, we've also -- have seen in subanalyses that we're putting in posters that the over 65 for Medicare population had even larger magnitude benefits that the whole population had a benefit, and so that's important again with the early data that Medicare already had and made their positive coverage decision before.

(Emphasis Added).

75.     The statements in the above press release were materially false and misleading for the same reasons outlined at ¶ 56 above.

76.     On February 5, 2019, during Myriad's Q2 2019 conference call, Individual Defendant's once again boasted about Myriad's numerous post-hoc analyses of the GUIDED study data, including that the GUIDED study that had resulted in allegedly positive results. Capone said:

On the Investor Call summarizing the complete dossier, we noted that additional analysis was completed for patients that were Medicare eligible based upon their

age when they enrolled in the study. Despite the substantially smaller sample size, the ***results showed statistically significant improvements across all HAM-D17 endpoints at week 8***.

* * *

The GeneSight GUIDED patients did numerically better than patients in an optimized active drug arm in all 15 endpoints, with 13 of those endpoints achieving statistical significance and the other 2 approaching significance. There was a preponderance of evidence demonstrating that the population of patients expected to benefit from GeneSight, which was a 70% of patients entering the study on yellow or red medications ***saw significant improvement in outcomes***. And the patients that entered the study on red medications and were switched from those medications ***saw an unprecedented improvement in outcomes.***

As APA guidelines note, the only acceptable outcome for treatment of depression is remission, and GeneSight has clearly demonstrated the ability to help physicians achieve this goal. Moreover, the GUIDED data show that these results were durable and continued to improve over the 24-week study period with remission doubling to 30%.

(Emphasis Added).

77.     The above statements were materially false and misleading when made because: (a) Myriad only reported some of the study's 65 secondary endpoints; (b) rather than showing "statistically significant improvements across all HAM-D17 endpoints at week 8," "significant improvement in outcomes" and an "unprecedented improvement in outcomes," the results of Myriad's post-hoc subgroup analyses were not statistically significant or clinically meaningful, as Myriad's scientists also internally acknowledged; (c) FDA guidance and standard clinical trial practice make clear that GUIDED study's post-hoc could not even be analyzed, as there was no "demonstration of a treatment effect on the primary endpoint family;" and (d) Myriad failed to disclose that multiplicity adjustments required by Myriad's own pre-specified the GUIDED study's protocol demonstrated that none of the results of its post-hoc analyses were statistically significant in favor of GeneSight.

78.     On May 7, 2019, during Myriad's third quarter 2019 earnings call Individual Defendants continued to rely on the results of improper GUIDED study post-hoc subgroup

analyses. Capone said:

> To continue strengthening the dossier, we are publishing data on 2 additional analyses from the GUIDED study.
>
> First analysis evaluates the subset of patients that entered the study on medications with gene-drug interactions, which is consistent with the indications for use for GeneSight. GeneSight is indicated for use by physicians contemplating an alteration in neuropsychiatric medications for patients with moderate to severe depression after at least 1 medication failure. Obviously, patients entering this study on green medications are no longer being considered for alterations in their medication. As such, those patients were excluded in this analysis and the patients in the GeneSight *arm had better outcomes in all 3 clinical endpoints of remission, response and symptom improvement. The results were statistically significant.*

(Emphasis Added).

79.     This statement was materially false and misleading when made because rather than being "statistically significant" or demonstrating that GeneSight patients "had better outcomes," the results of Myriad's post-hoc subgroup analysis was neither statistically significant nor clinically meaningful, as Myriad's own scientists internally acknowledged.

80.     The Individual Defendants also made claims to investors from the third and fourth quarters of fiscal 2019 that failed to disclose the abovementioned problems and inaccuracies with hereditary cancer test reimbursement and its misstatement of hereditary cancer test revenues. These false statements included:

> On February 5, 2019, at Myriad's second quarter 2019 earnings call, an analyst questioned Defendant Riggsbee about how Myriad had "reiterated guidance, but, obviously, we've had a few puts and takes with GeneSight" and queried "Should we assume that the overall GeneSight number for the year is going to be down relative to your initial expectations that's being made up for and things like hereditary cancer?" In response, Riggsbee said, "I think what I would say in terms of the back half of the year, we continue to be very pleased with our Hereditary Cancer business and the way that business has performed";
>
> On February 5, 2019, following a question from an analyst about Myriad's hereditary cancer billing practices, Capone said: "We've already made comments a year or so ago on how we've approached the billing for hereditary cancer testing and nothing has really changed from that perspective. Of course,

the only thing was the uncertainty around next-generation sequencing and where that fits. So I think, we're just going to have to see how this resolves itself as the industry engages";

Also on February 5, 2019, Defendant Capone boasted about the Company's success in transforming its hereditary cancer test franchise, stating "We delivered strong hereditary cancer results this quarter as year-over-year pricing headwinds abated and volume growth continued with total Hereditary Cancer revenue increasing 4% year-over-year and 9% sequentially";

On May 7, 2019, during Myriad's third quarter fiscal 2019 earnings call, Capone continued to boast Myriad had turned around its hereditary cancer segment. In his words, "The hereditary cancer business has returned to growth for 2 consecutive quarters and we are expecting stable revenue in fiscal year 2020";

On May 7, 2019, in a Form 8-K that Myriad filed with the SEC, Myriad explained that hereditary cancer test "revenue growth reached four percent, the highest in the last five fiscal years" and claimed that the Company had "[a]chieved [its] . . . sixth consecutive quarter with stable hereditary cancer pricing"; and

Also on May 7, 2019 call, Capone said "Revenue in the third quarter was $216.6 million, which met expectations as a result of continued year-over-year growth in hereditary cancer revenue and 51% new product volume growth." Defendant Riggsbee also added that: "Hereditary cancer revenue in the quarter of $117.6 million was up 4% compared to $113.1 million reported in the third quarter of fiscal year 2018." Specifically, in providing guidance on hereditary cancer pricing, Riggsbee claimed that "[w]e have made substantial progress with the hereditary cancer payer contracts, and as a result are anticipating that hereditary cancer revenues in fiscal 2020 will be relatively flat compared to fiscal 2019 as increasing volumes will offset very modest anticipated price declines".

81.    The above statements were materially false and misleading because they failed to state that in violation of GAAP, Myriad was improperly reporting hereditary cancer test revenue on the incorrect assumptions that: (a) payers would consent, without question, to the Company's unilateral decision to replace its obsolesced billing codes with the most expensive alternative; (b) the significant increase in denied and short-paid claims would reverse itself; and (c) therefore, Myriad had falsely inflated its hereditary cancer test revenue.

82.    In Myriad's Quarterly Report on Form 10-Q filed with the SEC on May 8, 2019, which reported the Company's financial and operating results for the Company's third quarterly

period ended March 31, 2019 (the "3Q 2019 10-Q"), Myriad stated:

> During the quarter ended December 31, 2018, the results of the GeneSight GUIDED study, the largest pharmacogenomics study ever in depression, was accepted for publication in the Journal of Psychiatric Research. ***The key finding of the study was that patients were 50 percent more likely to achieve remission and 30 percent more likely to respond to treatment when their medication selection was guided by the GeneSight Psychotropic genetic test.***

(Emphasis added).

83.     During the May 21, 2019 UBS Global Healthcare Conference, in response to a question from an analyst on how payor coverage would coincide with payers' review of the GUIDED study, Defendant Capone touted the results of Myriad's post-hoc analysis, supporting GeneSight's efficacy:

> Specifically, the GUIDED study, the Phase III study, we saw **statistically significant improvements in remission and response…**
>
> One of the suggestions that was made during the publication of the GUIDED study was that, that analysis should actually be redone in the format of a precision medicine product, which is to look at how GeneSight did in the intended use population, the benefit that is expected -- or the population that is expected to benefit from that. So if you looked at the study, about 30% of the patients that entered this study, were actually already on appropriate medications. So it's a very reasonable ask to look at the performance of GeneSight in the 70% of patients that were expected to benefit from GeneSight and were on medications that had some gene-drug interaction. So that's the additional analysis that's been done. We've provided the top line results to investors for that. That's going to publication now. ***And what that showed is even better results, highly statistically significant results in every endpoint for the GeneSight treated arm.***

(Emphasis Added).

84.     The statements in the above press release were materially false and misleading for the same reasons outlined at ¶ 56 above.

### *The Company's Interactions with the FDA*

85.     During the Relevant Period, Individual Defendants also repeatedly made materially false and misleading statements and omissions concerning Myriad's discussions with the FDA

related to GeneSight. On Myriad's November 6, 2018 Q1 2019 earnings call, held just after the FDA issued its Safety Communication raising concerns about the efficacy of pharmacogenomic testing, Capone sought to reassure investors that the supposedly positive results of the GUIDED study would insulate GeneSight from FDA scrutiny. In particular, defendant Capone said that the FDA was "***well aware*** that there is a pretty significant difference between GeneSight, which is a combinatorial pharmacogenomic test that has ***clear clinical evidence demonstrating improved patient outcomes***. That that difference is pretty stark when you compare it to the single gene approach that one might see in the more recreational genomic testing[.]" (Emphasis Added).

86.    The above statement was materially false and misleading when made because, as Capone knew, the FDA had never indicated to Myriad that it was well-aware that GUIDED study provided "clear clinical evidence" of GeneSight's efficacy, differentiating it from other pharmacogenomic tests. To the contrary, the GUIDED study was not conducted or reported in accordance with FDA guidance and was reported misleadingly for the various reasons already outlined herein. Additionally, as Individual Defendants knew, there was no significant clinical evidence supporting the efficacy of GeneSight's ADHD and analgesic panels.

87.    Additionally on Myriad's November 6, 2018 earnings call, Defendant Capone claimed that GeneSight differed from the subjects of the FDA's scrutiny on the basis that, unlike other pharmacogenetic tests, GeneSight's clinical efficacy was supported by clinical evidence:

> Moving on to GeneSight. As many of you are aware the FDA issued a notice for pharmacogenomic testing last week cautioning providers and patients about tests with claims that are not clinically validated. We strongly agree with this position as unlike GeneSight most companies have not published clinical outcomes data supporting their tests. Studies have shown that pharmacogenomic tests are not interchangeable. As an example, a recent study published in the May issue of the Pharmacogenomics Journal compared 4 commercial pharmacogenomics tests for major depressive disorder and found that 19% of the time the test had conflicting clinical recommendations. The FDA has maintained their position to exercise enforcement discretion over LDTs [Laboratory Developed Tests] subject to congressional legislation. Myriad continues

to support additional oversight of LDTs through legislation to ensure a consistent level of clinical evidence for approved cleared tests. And we believe that GeneSight is the only pharmacogenomic test supported by level 1 evidence, which demonstrates improved patient outcomes.

As a reminder, GeneSight has completed 4 clinical studies, including the 1,200 patient prospective blinded and randomized guided study that *was conducted consistent with the FDAs guidance on clinical trials for depression*.

The GUIDED study compared to GeneSight arm to an active drug arm and demonstrated a 50% improvement in symptoms and 30% improvement in response rates, both of which were highly statistically significant, and a 14% improvement in symptoms, which was approaching statistical significance.

88.     Further, on Myriad's January 4, 2019 conference call to announce the publication of the GUIDED study, Defendant Capone described the "*design and rigor of the study [were] similar to studies conducted for a pharmaceutical seeking approval from the FDA*." The January 4, 2019 GUIDED study medical journal article itself, authored by Defendant Dechairo and others, claimed that "the study design *is in line with the recent FDA draft guidance for MDD [major depressive disorder] trials*." (Emphasis Added).

89.     On Myriad's January 4, 2019 conference call announcing the official publication of the GUIDED study, in response to an analyst's question about whether Myriad was a target of the FDA's crackdown on pharmacogenetic tests, Defendant Capone claimed:

We certainly have – obviously, there's public commentary that's been made, and we've had private discussions as well. I think I mentioned before, we happened to be at BioUtah together with Dr. Jeff Shuren [Director of the Center for Devices and Radiological Health at the FDA] on the day that, that actually came out. So I was there with him. Dr. Shuren was the keynote speaker there. And so we were there and got a chance to catch up on a number of topics that we discussed over the years. What I can say is they have always publicly differentiated between consumer testing and LDTs [Laboratory Developed Tests]. As you well know, there were efforts made a few years ago specifically to crack down on consumer testing. That's testing done on a more recreational basis without having health-care professionals involved. That has always been a significant concern for the agency, and I think that remains a concern for the agency that -- that is an area that they're concerned about how -- what the impact to patients could be for direct-to-consumer types of testing. *Obviously, we're in a very different space*. . . So I know there is a very clear distinction in the line, and I think that distinction remains.

(Emphasis Added).

90.     The above statements by Capone and Dechairo on November 6, 2018 and January 4, 2019 were materially false and misleading when made because the GUIDED study was not conducted or reported in accordance with FDA guidance. In conflict with FDA guidance, Myriad failed to report the results of a multiplicity adjustment (which was also in violation of Myriad's own pre-specified GUIDED study protocol), which would have demonstrated to investors that the Company chose to selectively choose secondary endpoints and post-hoc analyses that the Individual Defendants boasted about did not have any statistical significance. Specifically, FDA guidance and standard clinical trial practice make clear that the narrowly selected secondary endpoints and post-hoc analyses Individual Defendants boasted about could not even be analyzed, as there was no "demonstration of a treatment effect on the primary endpoint family."

91.     On May 7, 2019, during Myriad's Q3 2019 earnings call, in response to an analyst question about Myriad's ongoing conversations with the FDA, Defendant Capone acknowledged that Myriad had in fact previously sent data to the FDA regarding GeneSight without disclosing the full truth about the FDA's inquiry into Myriad:

> Yes. Thanks, Jack. I'd just refer back to the comments I think I made on the last call that serendipitously, I was actually at a conference with Dr. Jeff Shuren the day that 23andMe got clearance for their test, which, of course, was the other thing that came along that with that was the posting of the commentary from the FDA on their website and so we had a chance to talk at that point. It's not clear they were actually aware of GeneSight then. And so I brought Dr. Shuren up to speed on the product, did in fact acknowledge that we would have a publication coming out relatively shortly and that I would send a copy of that manuscript if they were interested. And so that's what we've done is mailed that to them. And so they have that manuscript. So to date, that's really any of the discussions have really been largely that. It's just us following up on sending them over that publication.

92.     The above statements were materially false and misleading when made because the GUIDED study was not done in compliance with FDA guidance. Specifically, against FDA

guidance, Myriad failed to report the results of a multiplicity adjustment (which was also in violation of Myriad's own pre-specified GUIDED study protocol), which would have showed to investors that the Company narrowly and misleadingly chose secondary endpoints and post-hoc analyses that the Individual Defendants boasted about but which did not have any statistical significance. The FDA guidance and standard clinical trial practice note that such narrowly selected secondary endpoints and post-hoc analyses that Individual Defendants boasted about could not even be analyzed, as there was no "demonstration of a treatment effect on the primary endpoint family." Further, the FDA was investigating the validity of the test's purported benefits, had expressed serious concerns to Myriad about GeneSight's efficacy, and had requested that Myriad make changes to the product which would mean it would not be commercially viable.

### *Individual Defendant's Overstate Myriad's Hereditary Cancer Test Revenue*

93.     On May 7, 2019, Myriad's filed a Form 8-K with the SEC which was executed by Defendant Riggsbee. The Form 8-K contained an earnings release and an earnings call slide presentation for the three and nine months ended March 31, 2019 which both reported hereditary cancer test revenue for the three months ended March 31, 2019 of $117.6 million.

94.     On May 8, 2019, Myriad filed the 3Q 2019 10-Q that was signed by Defendants Capone and Riggsbee. The 3Q 2019 10-Q also noted hereditary cancer revenue for the three months ended March 31, 2019 of $117.6 million and that "[t]he accompanying condensed consolidated financial statements have been prepared…in accordance with U.S. generally accepted accounting principles ('GAAP') for interim financial information and pursuant to the applicable rules and regulations of the Securities and Exchange Commission ('SEC')."

95.     On August 13, 2019, during Myriad's Q4 2019 earnings call, Defendant Riggsbee stated that "[h]ereditary cancer revenuein the quarter of $119 million, [] was up 1% on a sequential basis due to increased volumes."

96.     Additionally on August 13, 2019, Myriad filed a Form 8-K with the SEC that was executed by Defendant Riggsbee. The Form 8-K contained an earnings release and an earnings call slide presentation dated August 13, 2019 for the three and nine months ended June 30, 2019, which noted hereditary cancer revenue for the three months ended June 30, 2019 of $119 million.

97.     Also on August 13, 2019, Myriad filed a Form 10-K for the fiscal year ended June 30, 2019 ("2019 10-K") with the SEC that was signed by Defendants Capone, Riggsbee, Henderson, Gilbert, Best, Dreismann, Langer, and Phanstiel. The 2019 10-K, reported hereditary cancer revenue of $479.7 million for fiscal 2019 and claimed that "[t]he accompanying consolidated financial statements have been prepared…in accordance with U.S. generally accepted accounting principles ('GAAP') for financial information and pursuant to the applicable rules and regulations of the Securities and Exchange Commission ('SEC')."

98.     In support of the above 3Q 2019 10-Q and 2019 10-K filings, Defendants Capone and Riggsbee signed certifications pursuant to the Sarbanes-Oxley Act ("SOX Certifications"), appended to Myriad's. In these, Defendants Capone and Riggsbee affirmed that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.
>
> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

99.     Defendants Capone and Riggsbee's SOX Certifications were materially false and misleading when made because the SEC filings to which these certifications were attached did not disclose that Myriad had falsely inflated its hereditary cancer revenue, which had been reported in violation of GAAP and that Myriad was incorrectly recognizing hereditary cancer test revenue on

the assumptions that: (a) payers would consent, without question, to the Company's unilateral decision to replace its obsolesced billing codes with the most expensive alternative; and (b) the significant increase in denied and short-paid claims would not continue.

100.    The above figures reported by Myriad in respect of its hereditary cancer test revenue in the third and fourth quarters of fiscal year 2019 were materially false and misleading because, as the Company later acknowledged, Myriad exaggerated its reported hereditary cancer revenue during the third and fourth quarters of fiscal year 2019 by at least $18 million. This amount was material because had the amount not been overstated, Myriad's income before income tax in the third quarter of fiscal year 2019 would have amounted to a loss rather than a profit. In addition, the falsely inflated revenues during the third and fourth quarters of fiscal year 2019 overstated Myriad's financial prospects going forward because the overstatement failed to disclose to investors that the actual revenue accrual model for Myriad would mean a decreased revenue amount. Additionally, Myriad's allegations that the reporting of its third and fourth quarters of 2019 hereditary cancer test revenue amounts was prepared in accordance with GAAP was materially false and misleading because such reporting violated GAAP, as noted above.

**The Truth Begins to Emerge**

***The Lack of Clinical Evidence for a Gene-Drug Connection, GeneSight's Failed Efficacy, and the Inaccurate and Misleading Reporting of the GUIDED Study***

101.    The truth began to be revealed on October 31, 2018 when the FDA publicly issued a Safety Communication titled, "The FDA Warns Against the Use of Many Genetic Tests with Unapproved Claims to Predict Patient Response to Specific Medications: FDA Safety Communication." The FDA's Safety Communication warned investors that, as opposed to Individual Defendants' allegations, GeneSight was not "clinically proven" to match patients to specific medications and, in particular, that the test's efficacy was not supported by strong clinical

evidence meeting FDA guidance and standards.

102.    The FDA's Safety advice said that it was focused on "Genetic laboratory tests with claims to predict a patient's response to specific medications, that have not been reviewed by the FDA and may not be supported by clinical evidence." As an example of such tests, the FDA cited "genetic tests that claim results can be used to help physicians identify which antidepressant medication would have increased effectiveness or side effects compared to other antidepressant medications," like GeneSight's psychotropic panel. The FDA made clear it was skeptical that pharmacogenetic tests were supported by clinical evidence of efficacy and, specifically that no evidence of gene-drug connection had been established with respect to antidepressants. Moreover, the Safety Communication warned that physicians who changed their patients' prescriptions in response to such pharmacogenetic tests had made inappropriate, potentially dangerous, adjustments to their patients' medication, and warned other physicians against repeating these mistakes:

> However, **the relationship between DNA variations and the effectiveness of antidepressant medication has never been established.** The FDA is aware that health care providers may have made inappropriate changes to a patient's medication based on the results from genetic tests that claim to provide information on the personalized dosage or treatment regimens for some antidepressants. **Patients and health care providers should not make changes to a patient's medication regimen based on the results from genetic tests that claim to predict a patient's response to specific medications, but are not supported by scientific or clinical evidence to support this use**, because doing so may put the patient at risk for potentially serious health consequences.

(Emphasis Added).

103.    The FDA further warned doctors considering using any pharmacogenetic test not to rely on any therapeutic recommendations made by the test, but to review the drug's FDA-approved label, thereby nullifying GeneSight's key alleged benefit to the market, categorizing of drugs into recommended/not recommended categories:

If you are using, or considering using, a genetic test to predict a patient's response to specific medications, be aware that for most medications, the relationship between DNA variations and the medication's effects has not been established. Check the FDA-approved drug label, or the label of the FDA-cleared or approved genetic test for information regarding whether genetic information should be used for determining therapeutic treatment.

104.    Accordingly, the FDA raised questions about whether GeneSight added any clinical value other than a simple multi-gene screening test that was cheaper.

105.    Also on November 1, 2018, Dr. Jeffery Shuren, the head of the FDA's Center for Devices and Radiological Health and Dr. Janet Woodcock, the head of the FDA's Center for Drug Evaluation and Research, both issued a joint statement reiterating the warnings appearing in the FDA's Safety Communication the previous day. The joint statement made clear that the Safety Communication was supported by two authoritative regulatory agencies and therefore provided authoritative advice about pharmacogenetic testing. The statement noted that while the FDA had recently approved tests that identify genetic variants that may play a role in drug metabolism, "we have required that the test label make clear that it is not intended to provide information on a patient's ability to respond to any specific medication."

106.    These revelations directly conflicted with the way Individual Defendants had reported the results of the GUIDED study, the way it had been conducted, and the extent to which its results supported the efficacy of GeneSight's psychotropic panel.

107.    Rather than take stock of its communications with investors and the FDA Safety Communication, Individual Defendants embarked to continue to falsely tout the benefits of GeneSight.  For example, on November 6, 2018  at the Company's earnings call, Capone said that FDA was "well aware that there is a pretty significant difference between GeneSight, which is a combinatorial pharmacogenomic test that has clear clinical evidence demonstrating improved patient outcomes, [and] [t]hat difference is pretty stark when you compare it to the single gene

approach that one might see in the more recreational genomic testing[.]" These statements were materially false and misleading, especially at this late time when the FDA was issuing red flag warnings about Myriad's GeneSight test.

108.     On November 7, 2018, Barclay's stated that "[f]ollowing the FDA's announcement this morning we also now see new risks related to [GeneSight's] volume trajectory," and "Importantly for GeneSight, the FDA highlighted, 'Genetic tests with claims to predict whether some medications used to treat depression may be less effective or have an increased chance of side effects.' Myriad's GeneSight is one of several tests in a category of pharmacogenetics used for patients with treatment-resistant depression."

109.     Barclays specifically reported to investors that "[W]e continue to believe the FDA warning on pharmacogenetic testing in depression could raise risks for GeneSight coverage and volumes as well. We believe given the profile of the announcement, it will likely be raised to CMS' attention – posing risks for **non-coverage of the test.**" (Emphasis Added).

110.     Following this news, Myriad stock dropped more than 12.5%, falling from $45.03 at the close of market on October 31, 2018 to $39.40 on November 1, 2018, on heavy trading volume.

111.     On January 7, 2019 the Southern Investigative Reporting Foundation, a foundation devoted to financial investigative reporting published an article titled "Myriad Genetics: *This Company Has Great Difficulties Telling the Truth*" (the "January 7 2019 SIR Article"):

> Dr. Nemeroff described the trial as unsuccessful. "The most salient and most important finding in this study is the fact that **it's a failed study**," he said, adding that GeneSight's benefit for patients, as measured in the trial, "wasn't even close to being significant."
>
> During this call **Myriad chose to defend GeneSight's merits in a highly unusual fashion, however. Its director of clinical development, Bryan Dechairo, spoke up on the call 30 minutes in and after reading a prepared statement, started**

> **peppering Dr. Nemeroff with questions;** he even tried to query him about a 2006
> medical study mentioned in passing. Dr. Nemeroff, who had been politely
> answering all Dechairo's questions, quietly informed him that the premise of his
> last one "**doesn't hold water.**"
>
> Two portfolio managers told the Southern Investigative Reporting Foundation that
> they had never seen a public company's representative do something like this on an
> analyst's client call.

(Emphasis Added).

112.    In response to the above revelations, the Company's stock fell by 10% from
$31.32 on January 4, 2019 to $27.98 on January 7, 2019, on high trading volume.

113.    Even after the January 7, 2019 SIR Article which glaringly revealed to investors
that GeneSight efficacy was not proven, that the GUIDED study was a failure, and that the
Company was desperately trying to (but was unable to) refute this evidence, Individual Defendants
continued to issue false and misleading statements about GeneSight's efficacy and the strength of
the GUIDED study in order to ease the market's concerns, including fears of adverse regulatory
action. In particular, Individual Defendants specifically sought to discredit Dr. Nemeroff's
assertions outlined above in the January 7, 2019 SIR Article.

**Insider Sales**

114.    Between December 2017 and August 2019, while shareholders remained unaware
of the full truth regarding GeneSight's lack of efficacy, Myriad insiders unloaded nearly $17.2
million in Company stock at inflated prices.

115.    These sales included transactions by Defendants Capone and Riggsbee on August
1, 2019, the day the Company announced that UHC, one of the country's largest insurers, agreed
to cover GeneSight. The stock rose rapidly after this announcement, triggering sales by Defendants
Capone and Riggsbee.

116.    Insider sales by Defendants Capone, Riggsbee, and Langer were made while they

were in possession of material adverse nonpublic information regarding GeneSight and the GUIDED study at the times of their trades.

117.    Indeed, when the partial truth was revealed on August 13, 2019 Myriad's share price plummeted to below where it had been just prior to August 1, 2019 suggesting that investors considered the concealed information to be highly material, wiping out any gains attributable to the UHC announcement.

118.    According to the proxy statement filed on October 15, 2020 (the "2020 Proxy"), Defendant Capone received approximately $22,126,000 in total compensation for fiscal years 2018, 2019 and 2020 combined. Thus, his insider sales proceeds of $12,700,000 sold just prior to the negative news at various times was more than half his total compensation over three years.

**The Truth Continues to Emerge After Defendants Capone, Riggsbee, and Langer's Insider Sales**

***Myriad Admits to Failure of Efficacy of GeneSight's ADHD and Analgesic Product and FDA Scrutiny of the Psychotropic Product***

119.    After the market closed on August 13, 2019, Myriad held its fourth quarter and full-year 2019 earnings call. After aggressively boasting to investors about GeneSight's efficacy for nearly three years, Myriad shocked the market by disclosing that by no later than May 2019, Myriad had withdrawn GeneSight's ADHD and analgesic panels. Myriad finally acknowledged that, contrary to Individual Defendants' repeated statements during the Relevant Period, GeneSight's ADHD and analgesic panels were not supported by adequate evidence and, as a result, payers had would not reimburse for administration of these panels and declined to offer coverage of GeneSight generally. Defendant Riggsbee stated, in relevant part:

> In May, we made the decision to discontinue our analgesic and ADHD products because of **the level of clinical evidence did not meet the same high standard set by the GeneSight psychotropic test in the GUIDED study. In addition, a few payers expressed similar views, and we wanted to eliminate any**

**potential hurdles to commercial payer coverage for GeneSight psychotropic.**

(Emphasis Added).

120. Myriad further disclosed that because the ADHD and analgesic panels were substantial drivers of overall demand for GeneSight, discontinuation of these panels had significantly impacted the Company's GeneSight revenue, including by reducing demand for GeneSight's psychotropic panel. Specifically, Riggsbee stated that "there was a collateral impact of the GeneSight psychotropic orders from ADHD and analgesic ordering physicians. The net effect was a 15% reduction in GeneSight revenue in June, which we expect to continue into the first quarter…[R]evenue in the first quarter will reset to a lower base following the discontinuation of the analgesic and ADHD test." Importantly, Myriad acknowledged that discontinuation of the ADHD and analgesic panels would negatively impact volumes for United Healthcare ("UHC"), countering the positive news Individual Defendants had selectively released just before their enormous insider sales just two weeks earlier.

121. During the call, Defendant Riggsbee further acknowledged that earlier in 2019, but unbeknownst to investors, the FDA had privately told the Company that the evidence it had submitted to the agency in support of GeneSight's psychotropic panel, including the GUIDED study, was not adequate, and requested that Myriad make changes to "the GeneSight test offering." Specifically, Riggsbee stated, "earlier in 2019, we provided the FDA with clinical evidence and other information to support our GeneSight psychotropic test. More recently, the FDA requested changes to the GeneSight test offering, and we have been in ongoing discussions with the FDA regarding its request." Investors were further shocked by this news as it conflicted with Individual Defendants' previous statements touting GeneSight's "clinically proven" efficacy and the results of the allegedly FDA-guideline-compliant GUIDED study.

122.    On this news, the Company's stock plummeted to $25.50 per share on August 14, 2019, a 42% decrease from the previous trading day's closing price of $44.55 per share.

123.    Even after these revelations, Individual Defendants continued to issue false and misleading soothing statements to the market in order to soften investor concern.

### Myriad Admits that it had Been Overstating its Hereditary Cancer Test Revenue

124.    On November 4, 2019, Myriad held an earnings call and further revealed that the Company's seemingly reliable hereditary cancer revenue was headed in a downward direction. Specifically, Myriad admitted that it had been experiencing a significant increase in the number of denied and partially unpaid claims for the Company's critical hereditary cancer test as a result of the AMA's change in billing codes discussed above, and had overstated revenue attributable to the test during the Relevant Period. Specifically, Capone stated that the "significant" revenue miss was "largely related to revenue adjustments associated with hereditary cancer testing…The root cause of this shortfall was driven by the deletion of the 81211 and 81213 codes beginning on January 1, 2019[,]" which "had been included in [Myriad's] payor contracts since 2012." Capone further stated that, rather than revise their payor contracts, Myriad's contracted payers were "notified" of the Company's "intent to crosswalk the new code to the historical contract pricing." Moreover, Capone admitted that for non-contracted payers, Myriad simply "assum[ed] . . . that these payers would cross-walk pricing to the Medicare clinical lab fee schedule for the new codes," and booked revenue "consistent with these assumptions."

125.    Defendant Capone further admitted that during the fourth fiscal quarter of 2019, Myriad "noticed that payments were not always consistent with our revenue accrual rate assumption. In fact, in some cases, claims were being denied entirely despite the fact that these payers had reimbursed claims for many years." The Individual Defendants still failed to disclose

that payers were seeking lower pricing of, and even refusing to cover, Myriad's key product and the highly material uncertainties and dubious assumptions underlying its revenue accrual.

126.    Defendant Capone was forced to admit that Myriad had to take an $11 million adjustment and, more significantly, lower its revenue accrual rate to be consistent with its "actual cash collection rate," reflecting payor retaliation to Myriad's unilateral selection of the most expensive available billing code for its test by far. Defendant Capone stated, "We believe the prudent approach at this point is to assume that we will not be able to correct these **administrative issues** and our lowered revenue accrual rates are consistent with our actual cash collection rate." (Emphasis added). Myriad's lowering of its revenue due to what Defendant Capone tried to downplay as "administrative issues" namely, the accrual rate had a significant impact on Myriad's financials going-forward, resulting in an 8% reduction in Company-wide revenue forecasts.

127.    Finally, Defendant Riggsbee acknowledged growing GeneSight revenue losses caused by the Company's removal of the test's ADHD and analgesic panels, amounting to a 25% loss in GeneSight revenue as compared to the previous year. These disclosures further showed to the market that the evidence supporting GeneSight was far weaker than previously disclosed, since the payers and clinicians in a position to evaluate those claims were declining to adopt or cover GeneSight.

128.    On this news, Myriad's stock declined sharply, falling more than 40%, from $35.10 to $20.93 on November 4, 2019, on heavy trading volume.

**The Truth Fully Emerges**

***Myriad Abruptly Announces Defendant Capone's Resignation and Continued Over-Accrual of Revenue***

129.    At its fiscal second quarter 2020 earnings call, held after the market closed on February 6, 2020, Myriad announced that Capone – who had been with Myriad for 17 years was

suddenly leaving the Company. The Board's decision followed the Company's disclosures concerning the Company's withdrawal of two of GeneSight's key panels and the FDA's request that the Company make commercially devastating changes to the remainder of the test. Those devastating changes caused GeneSight to no longer be commercially viable and Myriad's hereditary cancer revenue to over-accrue. During the earnings call, Defendant Riggsbee further disclosed that he would be named interim-CEO for the period that the Board searched for Defendant Capone's replacement, making clear that Capone's departure was not part of an orderly succession plan.

130.     Significantly, analysts on the call questioned Myriad management's credibility and queried whether further steps should be taken. A Cowen and Company, LLC analyst asked Defendant Riggsbee:

> Does a change of CEO go far enough? I know this is pretty direct, Bryan. And **I don't mean to be rude, but I think it's fair to ask why investors should trust the broader management team and really largely the same Board of Directors that has been at the helm for the past decade**. **And why should investors trust this management team and this Board to make the right decisions after a decade-plus of making so many wrong ones.** What comes next in terms of leadership change, not just at the management, but also at the board level? And on what timeline should we expect to hear more?

(Emphasis added).

131.     In addition, Myriad disclosed that its statements boasting about the UnitedHealth coverage decision as a watershed moment for GeneSight were false. To the contrary Myriad was experiencing serious challenges getting reimbursement from the payor for administering the test and, as a result, there was almost no contribution to GeneSight sales from the coverage decision. During the call, Defendant Riggsbee disclosed that it had a significant revenue shortfall, "well below our financial guidance for the quarter" due to "lower-than-anticipated GeneSight cash collections from UnitedHealthcare." Specifically, Myriad stated that UnitedHealth was denying

and short-paying a highly significant number of claims. Defendant Riggsbee announced lower guidance for the remainder of fiscal 2020 from $810 million to $735 million, approximately 9%, to account for GeneSight's poor revenue contribution.

132.    The market was shocked by Capone's sudden departure and understood that it signaled that its most important product, GeneSight, was in even greater jeopardy than previously disclosed.

133.    On this news, Myriad's stock fell to $21.02 per share on February 7, 2020, a 28% decrease from the previous trading day's closing price of $29.29.

### **The False and Misleading Proxies**

134.     In addition to the above false and misleading statements the Individual Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period. During the Relevant Period, the Individual Defendants that served on the Board during each relevant fiscal year, Defendants Henderson, Phanstiel, Capone, Dreismann, Gilbert, Langer, Best, Reitan and Newcomer (Reitan and Newcomer serving only for the fiscal year preceding the filing of the 2019 Proxy)  ("the Proxy Defendants") approved three Form DEF 14As before they were filed with the SEC on October 12, 2017 ("2017 Proxy"), October 10, 2018 ("2018 Proxy"), and October 16, 2019 ("2019 Proxy") (together "the Proxies"). The Proxy Defendants negligently issued materially misleading statements in the Proxies.[2]

135.    The 2017 Proxy sought stockholder votes to, among others, elect Defendants Gilbert, Langer, and Best for a three-year term. The 2017 Proxy assured stockholders that the

---

[2] These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they did not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

Board and its committees regularly assess and manage the risks that Myriad faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. The 2017 Proxy first stated:

### Board's Role in the Oversight of Risk Management

The Board has an active role, directly and through its committees, in the oversight of our risk management efforts. The Board carries out this oversight role through several levels of review. It regularly reviews and discusses with members of management information regarding the management of risks inherent in the operations of our businesses and the implementation of our strategic plan, including our risk mitigation efforts.

Each of the Board's committees also oversees the management of risks that are under each committee's areas of responsibility. For example, the Audit Committee oversees management of accounting, auditing, external reporting, internal controls and cash investment risks. The Nominating and Governance Committee oversees our compliance policies, Code of Conduct, conflicts of interest, director independence and corporate governance policies. The Compensation Committee oversees risks arising from compensation practices and policies. While each committee has specific responsibilities for oversight of risk, the Board is regularly informed by each committee about such risks. In this manner the Board is able to coordinate its risk oversight.

136.    Second, the 2017 Proxy stated:

**AUDIT COMMITTEE REPORT**

The Audit Committee of the Board of Directors, which consists entirely of directors who meet the independence and experience requirements of the NASDAQ Stock Market LLC, has furnished the following report:

The Audit Committee assists the Board in overseeing and monitoring the integrity of our financial reporting process, compliance with legal and regulatory requirements and the quality of internal and external audit processes. This committee's role and responsibilities are set forth in the Audit Committee Charter adopted by the Board, which is available in the Investors — Understanding Myriad/Corporate Governance section of our website at *www.myriad.com*. This committee reviews and reassesses the Audit Committee Charter annually and recommends any changes to the Board for approval. The Audit Committee is responsible for overseeing our overall financial reporting process and for the appointment, compensation, retention, and oversight of the work of our independent registered public accounting firm.

In fulfilling its responsibilities for the financial statements for the fiscal year ended June 30, 2017, the Audit Committee took the following actions:

- Reviewed and discussed the audited financial statements for the fiscal year ended June 30, 2017 with management and Ernst & Young LLP, our independent registered public accounting firm;

- Discussed with Ernst & Young LLP the matters required to be discussed in accordance with Statement on Auditing Standards No. 16, *Communications with Audit Committees*; and

- Received written disclosures and letters from Ernst & Young LLP regarding its independence as required by PCAOB Ethics and Independence Rule 3526, *Communication with Audit Committees Concerning Independence,* and has discussed with the independent auditors, the independent auditors' independence; and

- The Audit Committee also considered the status of pending litigation, taxation matters and other areas of oversight relating to the financial reporting and audit process that the committee determined appropriate.

Based on the Audit Committee's review of the audited financial statements and discussions with management and Ernst & Young LLP, the Audit Committee recommended to the Board that the audited financial statements be included in our Annual Report on Form 10-K for the fiscal year ended June 30, 2017 for filing with the SEC.

137.    The 2017 Proxy assured stockholders that the Individual Defendants were involved with Myriad's operations, actively monitored the Company's risks and exposures, and acted in an ethical and legal manner. In reality, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in allowing the Company to make various false and misleading statements including and/or regarding: (a) the lack of scientific support for the efficacy of GeneSight; (b) claiming that the GeneSight psychotropic test was clinically proven, including by the findings of the GUIDED study when it was not; (c) stating that its GUIDED study was done in compliance with FDA guidance and falsely describing the FDA's view of, and investigation into, the GeneSight test; and (d)

overstating the revenues from its hereditary cancer test, a test for analyzing the risk of developing certain types of hereditary cancers.

138.     The 2018 Proxy and the 2019 Proxy contained comparable provisions to the 2017 Proxy outlined above (with the same wording with respect to Audit Committee Report, except for the fiscal year referred to) and were thus materially false and misleading.

139.     The 2018 Proxy recommended shareholders to elect Defendants Henderson and Phanstiel for a three-year term.

140.     The 2019 Proxy recommended shareholders to elect Defendants Capone, Dreismann, and Reitan for a three-year term.

141.     As a result of the materially false and misleading statements in the Proxies, the Company's stockholders voted via an uninformed stockholder vote to reelect certain Defendants.

142.     The Proxies were false and misleading because, while they assured investors that Myriad's Code of Business Conduct and its Audit Committee Charter were followed, the omissions and misstatements during the Relevant Period, demonstrated that the Individual Defendants did not comply with the stated provisions of those documents.

## FIDUCIARY DUTIES

143.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owe and continues to owe Myriad and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Myriad in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Myriad and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

144.     Each Individual Defendant owes and continues to owe Myriad, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

Company and in the use and preservation of its property and assets.

145.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Myriad, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Myriad, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

146.    To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)    conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(c)    remain informed as to how Myriad conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d)    truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**<u>Duties Pursuant to the Company's Code of Conduct</u>**

147.    The Individual Defendants, as officers and/or directors of Myriad, were bound by

the Company's Code of Conduct[3] (the "Code of Conduct") which required the following:

**Our Responsibilities**

As employees, officers and directors
We are committed to understand and follow the principles set forth in this Code. In addition, we must:

• be familiar with and follow all laws, regulations, policies and procedures that apply to our jobs;

• conduct business according to the highest ethical and legal standards;

• report concerns and known or suspected misconduct immediately.

As executives and managers
Supervisors
have additional responsibilities, including:

• acting as role models, holding ourselves to the highest standards of ethical business conduct;

• reinforcing our Code by regular communications to our employees emphasizing the importance of ethics and compliance;

• creating a positive work environment where employees are comfortable raising questions and concerns;

• monitoring employees' business conduct to ensure compliance with our Code;

• immediately reporting any known or suspected ethical or legal misconduct and never retaliating or ignoring acts of retaliation against others.

                                  ***

**Accurate books and records**

---

[3] *See* Myriad Code of Conduct:
https://investor.myriad.com/static-files/eec442d3-65ab-4053-b841-99bdc64e858d#:~:text=We%20must%20conduct%20business%20in,anti%2Dbribery%20laws%20and%20regulations.&text=Myriad%20is%20committed%20to%20always,suppliers%20to%20these%20same%20standards.

Accuracy in recordkeeping is essential to maintaining the trust of our patients, stockholders, customers and business partners. This is a responsibility we all share. In every transaction, comply with our internal systems, controls and procedures to ensure compliance with the law and the proper management of our records. If you are involved in any aspect of our accounting or financial reporting processes, make sure our records accurately and honestly reflect all transactions. Never misreport or misrepresent data or information.

• **Record Retention:** In order to maintain an efficient and responsible record management program, you should familiarize yourself with the record management processes applicable to your job duties and follow our record retention schedule.

*** 

Inside information / insider trading Myriad expressly forbids any employee from trading on material non-public information or communicating material non-public information to others in violation of the law. This conduct is frequently referred to as "insider trading." This policy applies to every employee of the Company and extends to activities both within and outside their duties to the company, including trading for a personal account. The concept of who is an "insider" is broad. It includes officers, directors and employees of a company, and can include anyone living in the same household of an employee (whether related or not), and anyone dependent on an employee (whether living in the same household of an employee or not). In addition, a person can be a "temporary insider" if he or she enters into a special confidential relationship in the conduct of a company's affairs and as a result is given access to information solely for the company's purpose. A temporary insider can include, among others, a company's investment advisor, agent, attorney, accountant and lending institution, as well as the employee of such organization. An employee may also become a temporary insider of another company with which our Company has a contractual or other relationship. As an employee of Myriad, you may learn about Company information related to sales, product launches, mergers and acquisitions, etc., that could affect the Company stock. It is illegal to buy, sell or trade stock based on this information before it has become public.

*** 

Avoiding conflicts of interest A conflict of interest may exist when your loyalties or actions may be divided between Myriad's interests and those of another party, such as a competitor, supplier, family member or customer. Both the fact and the appearance of a conflict should be avoided. If you are unsure as to whether a certain transaction, activity, or relationship constitutes a conflict of interest, you should discuss it with your Compliance Officer.

When you have a potential conflict of interest, the Company expects you to come forward and disclose it so that it can be managed, reduced or eliminated. Failure to

disclose a potential conflict of interest is a violation of the Code.

\*\*\*

Corporate opportunities

Business opportunities you learn about as a result of employment with Myriad belong to Myriad, if within the scope of Myriad's existing or contemplated business, and should not be taken advantage of for personal gain unless prior written approval is received from the Corporate Compliance Committee's Conflict of Interest Sub-Committee.

148.   In addition to these duties, the Individual Defendants who served on the Audit Committee during the Relevant Period, Phanstiel, Best, Langer and Reitan (the "Audit Committee Defendants"), owed specific duties to Myriad under the Audit and Finance Committee Charter (the "Audit Charter").[4] Specifically, the Audit Charter provided for the following responsibilities of the Audit Committee Defendants:

provide assistance to the Board…in fulfilling the Board's responsibility to the Corporation's stockholders relating to the Corporation's accounting and financial reporting practices and system of internal control, the audit process, the quality and integrity of the Corporation's financial reporting, and the Corporation's process for monitoring compliance with laws and regulations, its code of conduct, and significant financial commitments.

\*\*\*

**DUTIES AND RESPONSIBILITIES**

\*\*\*

The following shall be recurring duties and responsibilities of the Committee in carrying out its purposes. These duties and responsibilities are set forth below as a guide to the Committee, with the understanding that the Committee may alter or supplement them as appropriate under the circumstances, to the extent permitted by applicable law.

---

[4] *See* Myriad Audit Charter at:
https://investor.myriad.com/static-files/6419005a-c00c-4025-abd8-4b760161bfce

A. <u>Document Review and Reporting Process</u>

1. Review and reassess, at least annually, the adequacy of this Charter, recommend any proposed changes to the Board for approval, and ensure appropriate disclosure as may be required by law or regulation.

2. Review with management and the independent auditor the Corporation's annual financial statements and Form 10-K prior to the filing of the Form 10-K or prior to the release of earnings, including a discussion with the independent auditor of the matters required to be discussed under the applicable Statements of Auditing Standards ("SAS").

3. Review with management and the independent auditor each Form 10-Q prior to its filing or prior to the release of earnings, including a discussion with the independent auditor of the matters required to be discussed under SAS. The Chairperson may represent the entire Committee for purposes of this review.

4. Review with management the earnings press releases for each completed fiscal period prior to their release.

5. Review with management and the independent auditor the effect of regulatory and accounting initiatives that may affect the Corporation, as well as the effect of any off-balance sheet structures and transactions on the Corporation's financial statements.

6. Regularly report to the Board about the Committee's activities, issues, and related recommendations.

7. Foster an open avenue of communication between the internal audit function, if any, the independent auditor and the Board.

8. Report annually to the stockholders, describing the Committee's composition, responsibilities and how they were discharged, and any other information required by applicable rules and regulations, including approval of non-audit services.

9. Review any other reports the Corporation issues that relate to the Committee's responsibilities.

10. Perform other activities related to this Charter as requested by the Board or the Chair of the Board.

11. Institute and oversee special investigations as needed.

12. Confirm annually that all responsibilities outlined in this Charter have been carried out.

***

Financial Statements

***

3. Review the annual audited financial statements, consider whether they are **complete, consistent with information known to the Committee members and reflect appropriate accounting principles**; and, following consultation with management and the independent auditor, consider whether to formally recommend to the Board that they be included in the Corporation's annual report on Form 10-K.

4. Review other financial or risk-related sections of the annual report and related regulatory filings before release and consider the accuracy and completeness of the information.

5. Review with management and the independent auditor all matters required to be communicated to the Committee under generally accepted auditing standards.

6. Understand how management and the internal audit function, if any, prepare interim financial statements, and the degree of involvement of the independent auditor in the review process.

7. Review interim financial statements with management and the independent auditor before filing with regulators, and consider whether financial statements are complete and consistent with the information known to the Committee members.

149.    The Audit Committee Defendants failed to fulfill their duties as required by the Audit Charter by allowing the Company to issue materially false and misleading statements regarding: (a) the lack of scientific support for the efficacy of GeneSight; (b) claiming that the GeneSight psychotropic test was clinically proven, including by the findings of the GUIDED study when it was not; (c) stating that the GUIDED study was done in compliance with FDA guidance and falsely describing the FDA's investigation into the GeneSight test; and (d) overstating the revenues from its hereditary cancer test, a test for analyzing the risk of developing certain types of hereditary cancers.

### **BREACHES OF DUTIES**

150.    The conduct of the Individual Defendants complained of herein involves a knowing

and culpable violation of their obligations as officers and/or directors of Myriad, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

151. The Individual Defendants breached their duties of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the extensive problems regarding Myriad's key products, including: (a) the lack of scientific support for the efficacy of GeneSight; (b) claiming that the GeneSight psychotropic test was clinically proven, including by the findings of the GUIDED study when it was not; (c) stating that the GUIDED study was done in compliance with FDA guidance and falsely describing the FDA's investigation into the GeneSight test; and (d) overstating the revenues from its hereditary cancer test, a test for analyzing the risk of developing certain types of hereditary cancers.

152. The Individual Defendants also breached their duties of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Myriad substantial damage.

153. The Audit Committee Defendants had a duty to review the Company's press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Myriad's public statements and internal control functions.

154. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Myriad, were able to, and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the

other Individual Defendants from taking such illegal actions. In addition, as a result of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, Myriad has expended, and will continue to expend, significant sums of money.

## DAMAGES TO MYRIAD

155.     The materially false and misleading statements have exposed the Company to myriad reputation and financial damages, including but not limited to:

   (a)  Restatements and goodwill impairments;

   (b)  Liability arising from the Federal Securities Class Action;

   (c)  Increased director and officer insurance premiums;

   (d)  The loss of credibility with partners and investors; and

   (e)  Legal costs associated with litigation, investigations and restatements.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

156.     Plaintiff brings this action derivatively and for the benefit of Myriad to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Myriad, waste of corporate assets, unjust enrichment, insider trading, and violations of the Exchange Act.

157.     Myriad is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

158.     Plaintiff is, and has been continuously, a stockholder of Myriad. Plaintiff will adequately and fairly represent the interests of Myriad in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

159.     Plaintiff incorporates by reference and re-alleges each allegation stated above as if

fully set forth herein.

160.    A pre-suit demand on the Board is futile and, therefore, excused. The current Board consists of nine current directors: Defendants Dreismann, Langer, Newcomer, Phanstiel, and Reitan (the "Director Defendants"), along with non-party directors Paul J. Diaz ("Diaz"), Rashmi Kumar, Daniel M. Skovronsky, and Daniel K. Spiegelman. Plaintiff needs only to allege demand futility as to a majority (five) of the directors who are on the Board at the time this action is commenced.

161.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

162.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

163.    Defendants Dreismann, Langer and Phanstiel signed the false and misleading 2017 10-K, 2018 10-K, and 2019 10-K, which represented that GeneSight was proven to enhance medication selection, thus, these Defendants are unable to consider a shareholder demand.Furthermore, the Director Defendants were aware or should have been aware that

Defendants Capone, Riggsbee, and Langer were selling enormous amounts of the Company's stock while in possession of adverse material nonpublic information, however they did not proceed to prevent such trading, nor have they acted to enforce the Company's rights to recover illegal profits obtained by Defendants Capone, Riggsbee, and Langer.

164.   The Director Defendants have not taken action to stop or prevent the Company from issuing its false and misleading statements regarding GeneSight. In addition, even after Judge Barlow's decision in the Class Action, wherein he affirmed that Defendants Capone and Riggsbee's stock sales were indicative of scienter, there is no indication that the Board has taken any steps to seek to claw back the insider trading proceeds or improper incentive based compensation awarded to fiduciaries during the course of the misconduct.

165.   The 2019 Proxy states that Defendants Newcomer and Dreismann while serving on the Compensation and Human Capital Committee during the Relevant Period, approved generous compensation to the Company's executives, even while these persons were causing the Company to issue false and misleading statements and engage in insider sales as outlined herein. Newcomer's approval of this compensation, while this wrongdoing was occurring constitutes a breach of fiduciary duty.  Riggsbee received a raise over his 2019 base salary.

166.   Additionally, the Director Defendants orchestrated and managed Defendant Capone's departure from the Company and generous compensation following his departure, even after he had been largely responsible for the false and misleading statements, and insider sales, outlined herein.

167.   Under the Separation Agreement, dated May 6, 2020 ("the Separation Agreement"), Defendant Capone was entitled to receive a severance payment of $600,230 together with a total "consulting fee" of $229,500, bringing his total departure payment to $829,730. The

Director Defendants approval of this excessive and unwarranted severance package was in breach of their fiduciary duties to the Company, excusing demand.

168.    The Federal Securities Class Action is still pending. Thus, the pendency of the Federal Securities Class Action means it is impossible for the Director Defendants to impartially consider a stockholder demand as to the allegations herein. In the Federal Securities Class Action, Judge Barlow affirmed that most of the lead plaintiff s allegations that the Company's public statements, outlined herein, concerning GeneSight and the GUIDED study, were false and misleading when made, and that they were made with fraudulent intent.

169.    Many of the materially false and misleading statements were made in furtherance of the Individual Defendants' scheme regarding GeneSight.

170.    Demand upon non-party Diaz is futile and excused because the Proxy Statement filed April 15, 2021, admits that he is not independent. As President and CEO, he is beholden to the Board, and his position is his primary source of income.

171.    As trusted Company directors, the above directors conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

172.    Pursuant to the Company's Audit Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants

failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, and allowed the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them. Further, they failed to disclose that the Company was manipulating hereditary cancer revenues.

173.     In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

174.     Myriad has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Myriad any part of the damages Myriad suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

175.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Board faces a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

176.    The acts complained of herein constitute violations of fiduciary duties owed by Myriad's officers and directors, and these acts are incapable of ratification.

**Insurance Considerations**

177.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Myriad. If there is a directors' and officers' liability insurance policy covering the Relevant Period, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Myriad, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

178.    If there is no directors' and officers' liability insurance, then the Director Individual Defendants will not cause Myriad to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

179.    Thus, for all the reasons set forth above, all of the Director Defendants, and, if not

all of them, at least a majority of the Board, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against the Individual Defendants**
*for Violations of Section 14(a) of the Exchange Act*

180.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

182.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

183.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false

or misleading." 17 C.F.R. § 240.14a-9.

184.    The Proxies also stated that the Company's directors and employees, including its principal executive officer, principal financial officer, principal accounting officer, and controller, or persons performing similar functions, are subject to the Company's Code of Conduct.  The Proxies were also false and misleading because, despite assertions to the contrary, Myriad's compliance with its respective codes of conduct were not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

185.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2018 Proxy and 2019 Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

186.    The false and misleading elements of the annual Proxies led to the re-elections of all of the Director Defendants, allowing them to continue breaching their fiduciary duties to Myriad.

187.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies

188.    Plaintiff, on behalf of Myriad, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

189.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.    The Individual Defendants, by virtue of their positions with Myriad and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Myriad and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Myriad to engage in the illegal conduct and practices complained of herein.

191.    Plaintiff, on behalf of Myriad, has no adequate remedy at law.

### **THIRD CLAIM**

**Against Individual Defendants**
*for Breach of Fiduciary Duties*

192.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Myriad's business and affairs.

194.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

195.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Myriad.

196.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

197.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

198.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements regarding: (a) the lack of scientific support for the efficacy of GeneSight; (b) claiming that the GeneSight psychotropic test was clinically proven, including by the findings of the GUIDED study when it was not; (c) stating that the GUIDED study was done in compliance with FDA guidance and falsely describing the FDA's view of, and investigation into, the GeneSight test; and (d) overstating the revenues from its hereditary cancer test, a test for analyzing the risk of developing certain types of hereditary cancers.

199.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

200.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

201.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain

adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

202.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

203.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Myriad has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

204.    Plaintiff, on behalf of Myriad, has no adequate remedy at law.

### FOURTH CLAIM

**Against Individual Defendants**
*for Unjust Enrichment*

205.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

206.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Myriad.

207.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Myriad tied to the performance or artificially inflated valuation of Myriad, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

208.     Plaintiff, as a stockholder and a representative of Myriad, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

209.     Plaintiff, on behalf of Myriad, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants
*for Waste of Corporate Assets*

210.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

211.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and Myriad will lose financing from investors and business from future customers who no longer trust the Company and its products.

212.     Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

213.     Plaintiff, on behalf of Myriad, has no adequate remedy at law.

## SIXTH CLAIM

### Against Capone, Riggsbee, and Langer
*for Insider Trading*

214.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

215.     As alleged above, Capone, Riggsbee, and Langer possessed adverse material non-public information regarding GeneSight, the GUIDED study, the FDA Interactions and overstated revenue from the Company's hereditary cancer tests. Capone and Riggsbee personally made

statements about GeneSight, the GUIDED study, the FDA Interactions and overstated revenue from the Company's hereditary cancer tests, while they and Langer profited from sales of Myriad stock. When Capone, Riggsbee, and Langer sold shares for total proceeds over $17.2 million between December 2017 and August 2019, while shareholders remained unaware of the full truth, they were motivated to do so, in whole or in part, by the possession of adverse material non-public information and they acted with scienter.

216.    When Capone, Riggsbee, and Langer sold their Myriad stock, they knew that the investing public was unaware of the adverse material information that they possessed. They also knew that if the information was disclosed, the market price of Myriad stock would be significantly lower. Capone, Riggsbee, and Langer timed their stock sales to take advantage of the Company's proprietary material facts and obtain a higher price for the stock they sold. They misappropriated Myriad's material non-public information for their own personal gains to the detriment of the Company and its stockholders.

217.    Plaintiff, on behalf of Myriad, has no adequate remedy at law.

## PRAYER FOR RELIEF

218.        **FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Myriad, and that Plaintiff is an adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached their fiduciary duties to Myriad;

C.    Determining and awarding to Myriad the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.     Directing Myriad and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Myriad and its stockholders from a repeat of the damaging events described herein;

E.     Awarding Myriad restitution from Individual Defendants;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court may deem just and proper.

Dated: September 17, 2021          Respectfully submitted,

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
(302) 803-4600
rernst@bk-legal.com

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
Ryan C. Messina
55 Broadway, 10th Floor
New York, NY 10006
T. 212.363.7500
F. 212.363.7171
gnespole@zlk.com
rmessina@zlk.com

*Attorneys for Plaintiff Karen Marcey*